WILLIAM P. ABEL and Others, Plaintiffs, *v.* CHARLES V. PATERNO and Others, Defendants.

Supreme Court, New York County, October 20, 1934.

*Hamilton Hicks* [*Jose R. F. Savage* and *Arthur N. Colton* of counsel], for the plaintiffs.

*Gallert, Hilborn & Raphael* [*Albert A. Raphael* of counsel], for the defendants except Wood, Dolson Company, Inc.

LEVY, J. This is an action in fraud and deceit. It is brought on behalf of about forty tenant owners of apartments in a co-operative development on Washington Heights, known as " Hudson View Gardens " and owned by a corporation of which defendant Charles V. Paterno is alleged to be the dominating head. The several plaintiffs ask for damages in their own respective rights, the actions being joined and tried as one because they involve essentially a common state of facts.

The development was begun by Paterno in 1923. Eight six-story and six four-story apartment houses were erected on the grounds and the individual apartments sold, or more properly leased, to the public on the co-operative plan. Each tenant acquired a twenty-one-year lease upon his apartment (with a privilege of renewal under certain conditions), upon purchase of a certain number of shares of the corporation known as " Hudson View Gardens, Inc.," which was supposed to represent the organized interest of all the tenants. That corporation had a capitalization of 52,468 shares, some of which were sold at fifty dollars a share and others at fifty-five dollars. The number of shares purchased was commensurate with the value of the apartment. In place of monthly rent the tenant paid his proportionate share of the running expenses, including interest and amortization on the mortgage.

The contracts under which the apartments of plaintiffs were acquired and the shares of stock in Hudson View Gardens, Inc., purchased by them were entered into at various times between 1924 and 1926. The tenants who are now complaining assert that they were induced to make their purchases by certain fraudulent representations and that they only discovered the fraud in 1933. The misrepresentations upon which they claim to have relied were: That the development included more than six acres, whereas it actually consisted of only three and seven-eighths acres; that the apartment buildings were built to be maintained at minimum cost but were, in fact, poorly constructed and required extensive repairs; and that the enterprise would be economical to operate, which was not the fact. The plaintiffs contend that the stock was not worth the purchase price of fifty dollars per share but considerably less, and they accordingly ask for damages.

The defendants who remain in the case are Charles V. Paterno, Vanderbilt Avenue Realty Corporation, Pinehurst Realty Cor-

poration and Karlopat Realty Corporation, the action having been dismissed as to Carlo Paterno and severed as to Wood, Dolson Company, Inc. The latter was the outside selling or leasing agent for the property; the Pinehurst Corporation was the more direct selling agent connected with the Paterno interests. The defendant Charles V. Paterno is alleged to have been the president of the various defendant companies, including Karlopat Realty Corporation, to which claims for unpaid balances due on the purchase price of the stock have been assigned. The defendants have all interposed a general denial and have also pleaded the Statute of Limitations. Defendant Karlopat Realty Corporation has a separate counterclaim against those plaintiffs who have not as yet fully paid for their stock for the balance of the purchase price.

The six-year Statute of Limitations applicable to actions in fraud would obviously apply were it not for the fact that plaintiffs insist they did not discover the alleged fraud until 1933. As to the claim of poor construction and the resulting increased cost of upkeep and the consequent effect upon the value of the stock, it must be said that a failure to make the discovery for eight or more years sounds disingenuous, and represents an obvious attempt to meet the defense of the Statute of Limitations. I have not given much consideration to this grievance. I do not believe that it has been proved, at least to the extent of warranting a finding that the Statute of Limitations was tolled by reason of the concealment by defendants and the impossibility or impracticability of plaintiffs discovering the facts prior to 1933.

As to the size of the acreage, however, a more serious situation is presented. Plaintiffs maintain that by reason of the irregularity of the plot, even those among them who were architects and engineers failed to discover the shortage in land. Defendant Paterno shows that he was entirely unaware of the size of the plot; that the statement of the acreage was inadvertent and the result of mistake. Only after it was represented to him in 1933 that a statement had been made in a prospectus that there were more than six acres in the land did he investigate and find the error. Since the main defendant himself did not discover the fact until 1933, we must accept as true the protestations of plaintiffs that they did not discover the shortgage until that year. Hence, the Statute of Limitations, so far as the acreage representation is concerned, must be deemed to have begun to run only last year.

I have no doubt that there was no intentional misrepresentation by defendant Paterno or those directly connected with him as to the size of the plot, and that the statement as to acreage was not

the result of a concerted attempt to defraud. Manifestly, an intentional misrepresentation of a fact so easy of verification could not have been expected from experienced and well-known real estate specialists. At all events, imminence of discovery would likely have been a deterrent. And yet there may be circumstances where a person may be held responsible for a falsehood uttered by others and innocently adopted by him. To determine whether such a situation exists here, we must examine more specifically the form in which the statements as to acreage were made.

The representations upon which plaintiffs base their grievances are found mainly in two pamphlets: one entitled "Hudson View Gardens Graphic" and the other "Hudson View Gardens." The first is in the nature of what might be called advertising literature, containing many illustrations and also a glorified description of Dr. Paterno and his record of achievement. On its first page in fine print is contained the item upon which plaintiffs mainly rely as the basis of their cause of action: "A new Seven Acre Garden Apartment Community completed in October 1924, * * *." On page 7 there is a heading: "Seven Acres of Elaborate Landscaping." This pamphlet may be said to have been superseded by the one entitled "Hudson View Gardens" by reason of the fact that the latter contains the proposed subscription agreement at the end, of which the following is a part: "The undersigned, herein referred to as the Subscriber, having read and approved the foregoing prospectus plan, proposal and offer, hereby accepts such offer, and in consideration of the same, and of the subscriptions to counterparts hereof by other persons, heretofore and hereafter made, hereby agrees with the other Subscribers, and with Paterno Construction Company to purchase from it .........shares of the capital stock of Hudson View Gardens, Inc., at Fifty Dollars per share, * * *." At the close of the agreement is found this paragraph: "The entire contract between the Builder and the Subscriber hereto is expressed herein and no officer of the Builder or agent or any other person is or has been authorized to make any representations other than as stated herein or to make any variations of or in this agreement unless approved by the Builder in writing over the signature of its President."

It must, therefore, be assumed that the representations relied on by the subscribers were those contained in the prospectus specifically referred to in the subscription agreement. That prospectus embodied the following statement: "Hudson View Gardens consists of a tract of land more than six acres in area." After briefly describing the location, it discloses that upon the property there have been erected eight six-story and six four-story

apartment houses under the supervision of its president, Dr. Charles V. Paterno. It then explains the organization of Hudson View Gardens, Inc., and the co-operative plan; that "all of the capital stock of Hudson View Gardens, Inc., is offered for sale to home seekers on the one hundred per cent co-operative plan, whereby the purchaser of the requisite number of shares of such stock will receive a ' proprietary lease ' of the apartment which he selects." An estimate then follows of the annual budget of expenses, including amortization and interest on the mortgage. Subscriptions are then invited for the stock and the proprietary leases to be issued by Hudson View Gardens, Inc., each share of stock being priced at fifty dollars, the number of shares to be purchased being based upon the selling price of the given apartment. A schedule of the several apartments and the number of shares of stock necessary to acquire one, together with the estimated annual rental value, annual assessment, etc., is also contained in the prospectus. There follows the subscription agreement already referred to and a statement that the construction company will arrange a loan to enable the subscriber to complete the purchase of the apartment.

Do these representations, in the light of the proofs, give rise to actionable fraud? The essential constituents of an action such as this have been repeatedly stated in terse form as representation, falsity, *scienter*, deception and injury. (*Ochs* v. *Woods*, 221 N. Y. 335; *Reno* v. *Bull*, 226 id. 546.) To express the same thought more directly in its application to the present situation, the plaintiffs were required to prove that the representations were false; that the defendants knew they were false; that they were made for the purpose of luring the purchasers into the transaction in reliance upon the truth of the representations; and that plaintiffs were thereby damaged.

The difficulty here is not with the proper comprehension of the rule but with its application so as to do justice to both sides. As to the fact that there were representations which, to put it euphemistically, were erroneous, there can be no doubt. Eliminating all the statements involving opinion and estimate of value, there still remains the one repeated in the very prospectus which embodies the contract of sale, that the property contained about six acres, when in truth it comprised less than four acres. The term " false " as a constituent of a fraud action may at times be said to be synonymous with " erroneous," and does not always imply deliberate deception. Erroneous information innocently repeated may nevertheless be false information. When we say here that the representation that the property contained six acres was false, we are not yet in the arena of actionable wrong in fraud. Parenthetically,

this is not an action in rescission. The element of *scienter* is an absolutely necessary constituent. I do not believe from the evidence that any willful falsehood was intended or that the statement was more than an unfortunate mistake on the part of some one. But even in such a case, if the principal had adopted an agent's fraudulent representation or accepted the fruits of it, though personally he did not participate in the fraud, he might still be charged with the consequence of the acts of his agent. The evidence on this point, at the very best, is rather meager, and in view of the severance of the action as against Wood, Dolson Company, Inc., quite inconclusive.

There are more substantial and less shifting grounds upon which to consider the question of plaintiffs' right to recover, and that is, whether they were actually deceived by the representations. In order to determine whether a party was influenced in his course of conduct by the false representations, it is necessary to ascertain whether or not he relied upon them. The claim of reliance, involving, as it must, a state of mind, is ordinarily most difficult to disprove. As is said in *Ochs* v. *Woods* (*supra*, at p. 338): " It is incumbent upon a plaintiff in an action for deceit through false representations to show that he was influenced by them. It does not require very strong proof to establish it. In most cases, it may be inferred from the circumstances attending the transaction. * * * A false representation is not cognizable by the law as deceit unless it is believed and relied upon as an inducement to action."

Let us examine the attendant circumstances of the purchase, as reflected here by the subsequent course of action of the parties, in order to determine whether plaintiffs relied upon the representation as to the amount of acreage. The first thing that strikes the impartial observer is that the main object of the transaction was the purchase of a co-operative apartment. The following features were stressed in the literature and the advertising: the co-operative element, the conveniences, the social features, and the economy of operation. The area of the land, most of which was devoted to landscaping purposes, received mere passing mention. There was no claim of misrepresentation as to the size of the structures or as to that of the apartments. Each tenant received a twenty-one-year lease with an opportunity for another twenty-one-year renewal. The course of development of the property in its state at the time of the respective sales was, therefore, practically fixed for forty-two years. The element of a possible enhancement of real estate values in Manhattan, and the resulting chances of realizing a much larger amount at the end of the forty-

two years, quite obviously played a very small part in the estimated valuation of the apartment purchased. Nor was the possibility ' of unconditional resale for profit stressed in any way. After all, the person purchasing an apartment must be deemed to have done so primarily to acquire a home.

If the decreased amount of elbow room, so to speak, by reason of the smaller acreage had a material influence upon the daily affairs of the denizens of the colony, there is no evidence of any complaint for nearly ten years. In other words, nobody noticed the shortage of the acreage, not even the founder himself. If it took about ten years to discover the misrepresentation, it is the most eloquent proof of the fact that it played no noticeable part in the bargain. The situation would have been quite different if a person bought a tract of land for subdivision into lots or plots and later discovered a shortage. Here, the plaintiffs purchased in a development which was virtually built up, and the amount of landscape space appurtenant to the structures, outside of what was visible, seemed a secondary consideration. Under these circumstances, it would appear to follow almost inevitably that the plaintiffs in making their investments gave no thought to the speculative possibilities of the tract because of its acreage, and that they thus have failed to prove that they were deceived.

It is consequently unnecessary to consider the question as to whether plaintiffs have proved any injury. At the same time, it must be observed that while the apartments have depreciated in value as all real estate has elsewhere, this cannot be charged to defendants. It would seem, however, that the latter are not entirely in error in attributing the present action to disappointed purchasers who, finding unpaid obligations due on depreciated investments, have attempted to avoid payment. In making this effort they have been joined by other tenant owners who, while they paid their purchase price in full, seized the opportunity of securing a possible rebate. It is perhaps significant that less than fifteen per cent of all the tenant owners, numbering some three hundred, have united in this action.

It necessarily follows that all the complaints demanding redress for fraud must be dismissed, as well as those which demand an injunction against the negotiation of the unpaid notes or the sale of the collateral under them. The counterclaims against the tenant owners on their unpaid notes must be decided in favor of the defendant Karlopat Realty Corporation, the holder. The acceleration clause in the contract made it unnecessary to demand payment or to give notice of acceleration of the principal prior to suit. Unless plaintiffs cured their default before notice of

acceleration or the interposition of the counterclaims, they are too late to make good. The bringing of the action — here the counterclaims — is itself a notice of the exercise of the right to accelerate. (*Albertina Realty Co.* v. *Rosbro Realty Corp.*, 258 N. Y. 472.) Nor can it be said that the course of conduct of the defendants in previously accepting the installments at irregular times, constituted a waiver of the right to accelerate.

While considerations of neighborliness and concord should sway the holder of the notes to reinstate them in accordance with the original tenor, this must be left to the good sense of the parties. There must be judgment for defendants dismissing the complaint and affirmative judgment for Karlopat Realty Corporation on the counterclaims.

Proposed findings and conclusions passed upon and the prevailing parties will submit decision and judgment accordingly.